OCTOBER AND NOVEMBER TERM, 1881, No. 299.

# Canan *versus* McCamy.

1. Where the plaintiff purchased a horse from the defendant, which was
balky, and he relied not upon an express warranty, but upon a representation
alleged to be false and fraudulent, the proper remedy was an action on the case
for deceit.

2. In such an action a justice of the peace has no jurisdiction.

ERROR to the Court of Common Pleas of *Armstrong County*.

Appeal by Samuel McCamy from the judgment of a jus-
tice of the peace, in favor of J. A. Canan for $45.50, in an
action brought by the latter against the former to recover
back the value of certain articles given in payment for a
horse sold and delivered.

Plaintiff filed a *narr in assumpsit*, containing the com-
mon counts, and a special count, setting forth that " the de-
fendant received from him one buggy, of the value of $60,
and a harness and other articles of personal property, of the
value of $30, for which the said defendant agreed to pay

[Canan *v.* McCamy.]

what would be a fair and reasonable price. Defendant gave
to the said plaintiff, as consideration for said property, a cer-
tain horse, which the defendant warranted to be sound and
a good and reliable horse to work in a wagon, either single
or double,—which said horse was not sound, nor was it re-
liable or of any use whatever as a working horse, nor was it
in any respect' such property as the defendant represented it
to be. The plaintiff could not use said property for the pur-
poses he intended, when bargaining for the same, nor was it
of any use to him. Which said property the plaintiff re-
turned to the defendant, and the plaintiff has not, therefore,
any value for the articles of property he sold and delivered
to the defendant."

Pleas *non assumpsit* and payment with leave, etc.

Upon the trial in the Court below, before NEALL, P. J.,
the plaintiff gave evidence that, on the 14th of August,
1879, accompanied by John Downey, he went to the house
of the defendant, to trade a buggy for a work horse. He
told defendant he wanted a good horse to make up a team.
Defendant pointed out a gray mare that he was willing to
trade. He said that she was a good worker, and that he
had done his work with her. He mentioned the horse was
lame in front in the foot and shoulders. "He said there
was nothing wrong about her but this lameness." Plaintiff
agreed to give the buggy and harness for the mare, and de-
fendant was to pay $5 in thirty days. On the way home
plaintiff discovered that the mare's wind was not very good.
A few days afterward he put her in a team to take a load,
and in going down hill she fell at different times, and held
back. The other horse pulled her and the load down hill.
He could not do anything with her. He could not get to
the place he wanted to load. He then went to defendant,
and told him the mare would not work, and demanded his
property. Defendant said that when he made a trade he
stood to it. Plaintiff tried her in a team again, and, after
going a rod or so, she drew back, and threw her head over
the other horse. They put a rope into her jaw, and she
threw herself back, and hurt her jaw. She stopped on going
down hill, and made a rear-up, and threw herself over into
a ditch. They could not push her along, and she would not
go under a saddle. She jumped out of a field at night, and
went back to the defendant's, and plaintiff left her there.
The value of the buggy, etc., was $55.50.

One witness testified that, in thirty-three years' experience
with horses, she was the only one he could not do anything
with, and another testified that he tried unsuccessfully to
lead her in an empty wagon, and that she was of no use to

any one. There was evidence that defendant knew she was balky before the trade.

The defendant, *Samuel McCamy*, testified:

" Mr. Canan came there, and Mr. Downey along with him, to trade with me, and I refused trading with them, would not trade with them at all, and he finally insisted until all the rest of the horses was in the stable, only this one. This one was running loose. After I refused trading, this one came around. I said, there is one if she suits you that I would not stop much to trade you. He asked me if she would work, and I replied that I had worked her. Well, he asked me, if she would haul her share of a ton from the river up here from my house. I told him no, I would not risk it. Well, that was all that was said with regard to trading. He said, after my reply, then if you worked her, we can work her, and we finally traded. I worked her for, I think, in the neighborhood of two years, when I had no other horse. I did all my work on the farm. I raised colts with her. The mare worked well when she was worked right. She was very highstrung, and one would have to be very careful with her. I hauled stuff for my farm with her, and we hauled also board, and stone, and the bottom timber with her. After I hauled for myself, I hauled for Mr. Forgie, but I don't recollect just the time. We hauled timber from the river up around Bear Creek, around several farms. We hauled up the large hill at ·Bear Creek, and up that steep hill at Lawrenceburg, and over heavy roads. She did not balk with me; I worked her when it was necessary, but did not work her for good. If he had asked me if she would pull a half ton, I would say no, because I didn't work her. I would not have taken $60 for the mare. The buggy I got went all to pieces. I calculated the harness was worth $10. I gave him $5 for the harness. I was to give it. I offered that to him—tendered it to him the Saturday before, I think. If I recollect right, it came due on Sunday. The mare came back, turned out. I seen her the next morning when I got up. Seen her standing at the gate at Mr. Cruther's woods. I went up and looked at her. She was what I call blind of one eye. The whole side of her head was black, clear from her ear down. The eye appeared like as if it was out. The under jaw was all cut the whole day. She was skinned between the forelegs, and I think she was lame. I did not take her back. Told him I would have nothing to do with her."

There were a number of witnesses who testified that the defendant had worked the mare, and hauled loads with her.

Counsel for plaintiff asked the Court to charge:

" If the jury believe that the defendant, McCamy, sold the mare in question to Canan, knowing a material defect, but did not disclose it, and if said defect was known to the buyer, and was not such a defect as a buyer of common prudence would be presumed to know, there was such fraud in the transaction as vitiates the contract, and the buyer may recover back the price paid for the mare."

The Court refused this point, and charged the jury, *inter alia :*

" It was in the power and it was proper for Mr. Canan, if he desired to buy such a horse as he could rely upon, to have required from him, the seller, a guarantee of that horse, and the seller warrant the horse, because he had a right to demand that, and if he refused to warrant the horse, then he made, as it has been often expressed by the trite expression known to you, 'that he made his eye his own market,' because [there is no warranty, no guarantee implied in the purchase of mere personal articles, chattels of that kind that a horse is. That every man has opportunity of inspection for himself, and if he is not satisfied with that inspection he has a further alternative of requiring a warranty that the horse shall come up to what he demands it was to be, and then, in case that it fails to come up to that, he can pursue the seller upon that warranty, and can claim and demand the money back that he pays him ; but in the face of no warranty they take the risk of purchasing themselves. They have a right to know what the goods are that they are buying, because they can see for themselves, and if they are not satisfied with the evidence of their own eyes they have the further right to test the qualities of the articles,—trying the horse either under the saddle or in the wagon, and could require and could have experimented with that horse before they took him away if they desired so to do. But failing to do that and taking the horse away he took him upon his own responsibility.]

[" There might be in this case a remedy or action arising from mere deception where deception had been practiced, that possibly would not come into consideration in a suit of this kind. If there had been any deception that had misled there is a right of action in what we call action upon the case for deceit, but whether it could come in here in the form of action we have considerable doubt.]

[" If it were an action upon a contract for the sale of a horse, brought by the vendor of the horse, we have no doubt that it could come in by way of defence ; but to bring the action for the transaction as fraud, and setting up as a question of that action the deceit of this party, we very consider-

ably doubt, and would so instruct you. That I may be distinctly understood, and that the party may have the full benefit of that instruction, that this is not the place to bring in mere deception.] If there was actual fraud, and if it were a fraud the rule would be different. And a fraud does not consist of mere statements of facts; but it is—that is a fraud where a man wilfully makes a statement with the purpose of cheating and defrauding. We call it fraud when statements of a deceptive character are made, calculated to defraud and cheat—as near as we can that is the definition for fraud. Now do you find in this case anything of that kind? [And it is for you to say, gentlemen, if there was such practice used by this man, who was sought out at his own home by the purchaser of this horse, and the horse was bought after words were passed between them. The important ones appear to have been whether he would or could pull a ton up a hill, and he answered he would not like to risk him as to that], and you will remember that he said he was all right. That is a question for you to determine whether he was all right, as to the whole soundness of the horse or not.

"If the horse was all right—if he got lame—got hurt, or something of that kind, that ruins the whole horse, as a work-horse, it will be for you to determine; because you have to interpret what this meant. And, if you find that there was actual fraud committed on this man, then there comes another question. It was the duty of this person, the plaintiff in this case, if he returns the articles, the goods, to the person who sold to him, the defendant in this case, to return them in the condition that he obtained him. Was he in that condition when the horse went to him? You have the testimony of the plaintiff himself in regard to the horse falling over a bank and getting some injury on his head. He does not state in the full manner that the defendant does, and therefore you have to reconcile their testimony as to that. The defendant says the horse was cut on the jaw and bruised and black around the head, and that he did not know whether his eye was out or not, and that it was swollen tight,—and injured about the eye.

"If there was a return of the money required in that case or the value of the goods that were given for that horse or the goods, he should have been returned in the condition that he was obtained from this defendant. You are to determine whether he was returned in that condition or not."

Counsel for plaintiff excepted to the answer to his point, and to the charge.

[Canan *v.* McCamy.]

December 25th, 1880, verdict for the defendant, upon which judgment was entered.

Plaintiff then took out a writ of error, assigning as error the answer to the point as above, and those portions of the charge within brackets.

*J. P. Colter* for plaintiff in error.

Fraud vitiates a contract, and if there was fraud in this sale, Canan had the right to return the property and demand back what he paid.

The words used and which caused the sale were tantamount to a warranty: Lowry *v.* McLane's Administrators, 3 Grant, 333; Babcock *v.* Case, 11 P. F. Smith, 421; Cornelius *v.* Molloy, 7 Barr, 293; Croyle *v.* Moses, 9 Norris, 250; Freyman *v.* Knecht, 28 P. F. Smith, 141; Esher *v.* Flagler, 17 S. & R., 141; Bright *v.* Getz, 32 P. F. Smith, 144.

*John Smullin* and *David Barclay* for defendant in error.

There was no evidence of warranty in the case. Without warranty there could not be want of or failure of consideration. Canan took at his own risk, and could not recover in this action: Eagan *v.* Call, 10 C., 237.

There was neither fraud nor warranty or agreement to return the horse, and the vendee could not rescind the contract after it had been executed: Freyman *v.* Knecht, 28 P. F. Smith, 141.

The plaintiff says there was an implied warranty in this case, because the mare was said by McCamy to be sound, and a fair price was paid for her. That an implied warranty cannot so arise is settled, by McFarland *v.* Newman, 9 Watts, 55, Whitaker *et al. v.* Eastwick, 25 P. F. S., 229.

Here was an absolute contract of sale or trade without warranty and without any right reserved to return the article. The vendee cannot rescind the contract. Kase *v.* John, 10 Watts, 107.

Nov. 7, 1881.—PER CURIAM : This was an appeal from the judgment of a justice of the peace. The declaration was in assumpsit in the common counts, with a special count—informally drawn—upon the warranty of a horse. It is not pretended there was any express warranty, but the plaintiff relied upon a representation alleged to be false and fraudulent. For that the proper action would be case for deceit, of which the justice had no jurisdiction.

Judgment affirmed.